UNITED STATES of America, Plaintiff–Appellee,

v.

**Eric R. MEYER and Gordon O. Hoff, Sr., Defendants–Appellants.**

Nos. 96–4230, 97–1031.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1998.

Decided June 23, 1998.

Amended Sept. 10, 1998.*.

---

* On consideration of the government's petition for rehearing, we have decided to amend the opinion. The petition for rehearing is denied.

John W. Vaudreuil (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Christopher T. Van Wagner (argued), Madison, WI, for Defendant–Appellant in No. 96–4230.

T. Christopher Kelly (argued), Thomas, Kelly, Habermehl & Wood, Madison, WI, for Defendant–Appellant in No. 97–1031.

Before CUMMINGS, WOOD, Jr., and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Appellants, Gordon Hoff, Sr., and Eric Meyer, were convicted after a jury trial of conspiracy to distribute cocaine and to possess cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and were each sentenced to life imprisonment. They raise

numerous issues on appeal. Both appellants argue that the district court erred in failing to give the jury a buyer-seller instruction and in finding that Hoff and Meyer had breached their immunity agreements. Hoff, individually, contests the admission of evidence obtained in a search of a refrigerator on his property and challenges the district court's decision to limit his cross-examination of a government witness. Additionally, both appellants appeal the district court's sentencing determination.

## I. BACKGROUND

In the fall of 1995, the FBI, together with local law enforcement officials, was investigating drug activity in northwestern Wisconsin and the disappearance, and possible murder, of three individuals thought to have connections to drug trafficking. In the course of that investigation, the authorities became aware of the activities of Appellant Gordon O. Hoff, Sr. ("Hoff"), and his son, Gordon O. Hoff, Jr. ("Rock"). On November 2, 1995, a grand jury in the Western District of Wisconsin issued an indictment charging Rock with involvement in a drug conspiracy and Hoff with intimidating a witness.

Following the indictment, Hoff's attorney approached the government to negotiate a cooperation agreement. The government entered into a written immunity agreement with Hoff on December 5, 1995. Pursuant to this agreement, Hoff was required to make "a full, complete and truthful statement regarding his involvement in violations of federal criminal statutes, as well as the involvement of all other individuals known to the defendant." In exchange, the government promised to dismiss the pending witness tampering charge against Hoff and not to charge him with any criminal violations relating to the drug conspiracy charged or with any controlled substance or money laundering violations.[1] The agreement was expressly contingent upon Hoff not having direct involvement in the commission of any homicide.

In reliance on the agreement, Hoff made incriminating statements to investigators and led them to the dead body of Dan Oestreich.

Hoff told the investigators that his son Rock had murdered Oestreich and another man, Kirk Larson, because Rock believed they were informants. Hoff also stated that he believed Rock had murdered Dennis Fenner, but that he had no specific information to confirm this suspicion. Hoff admitted that he had helped Rock dispose of Oestreich's body. Hoff told investigators that he did not use cocaine and that he had never been involved in selling cocaine. He stated that Rock was active in cocaine and marijuana trafficking. Hoff also mentioned Eric Meyer, a cocaine user, as an individual who might provide further information on Rock.

Following these revelations by Hoff, Hoff's attorney contacted the FBI and told them that, in exchange for immunity, Eric Meyer would be willing to make a statement corroborating the information that Hoff had provided. Hoff's attorney made it clear that he was representing Hoff and not Meyer. On December 11, 1995, an Assistant U.S. Attorney issued a use immunity agreement letter to Meyer. On that same day, at the FBI's request, Hoff and his attorney brought Meyer to the FBI offices for an interview. When he reached the FBI offices, Meyer signed a copy of the immunity agreement, which required that Meyer make "a complete and truthful statement ... regarding [his] knowledge of and involvement in criminal offenses including, but not limited to, controlled substance trafficking." In return, the government agreed that it would not use any of the statements that Meyer made pursuant to the agreement against him directly in any criminal proceeding. Once again, Hoff's attorney specifically stated that, although he was present, he did not represent Meyer.

Agent Southworth conducted the interview for the FBI. At the beginning of the interview, both Southworth and Hoff's attorney explained the immunity letter to Meyer and emphasized the importance of truthful information. The agent then proceeded to interview Meyer in the presence of both Hoff and Hoff's attorney. Hoff and his attorney were present during Meyer's entire interview.

---

1. The agreement refers to itself as both a "plea agreement" and an "agreement not to prosecute." To avoid confusion, and because the agreement did not require Hoff to plead guilty to any charges, we will refer to the document as Hoff's immunity agreement.

The agent did not specifically ask Meyer any questions about Hoff or Hoff's criminal activity. However, the agent did ask Meyer if he knew anything about Dennis Fenner's disappearance, to which Meyer claimed ignorance. During the interview, Meyer admitted to buying small quantities of drugs from Rock on several occasions, but did not tell the agent about any other drug activity.

Despite this cooperation, in February 1996, the government determined that Hoff and Meyer had not provided complete and truthful testimony as required under their agreements. Specifically, based on interviews with Rock, Rock's girlfriend, Hoff's daughter Joyell, and Kathy Modl, one of Hoff's drug customers, the government determined that Hoff and Meyer were active in a long-term conspiracy to distribute marijuana and cocaine and that Meyer had actually murdered Dennis Fenner at Hoff's direction because Hoff believed that Fenner had been planning on providing the authorities with information incriminating Hoff for drug dealing.

Due to the perceived breach of the immunity agreement by Hoff, the government believed that it was relieved of its obligation to refrain from prosecuting him. On February 28, 1996, a grand jury indicted Hoff for conspiring to distribute cocaine and to possess cocaine with the intent to distribute. The grand jury also indicted Eric Meyer on the same count. Following the indictment, the government determined that, in fact, it was Hoff who murdered Oestreich because he believed Oestreich was a police informant. The investigation also uncovered further evidence of Hoff and Meyer's extensive marijuana and cocaine trafficking.

Hoff filed a motion to dismiss the indictment, alleging that it violated his immunity agreement. On May 29, 1996, the magistrate judge held an evidentiary hearing on Hoff's motion at which the government attempted to prove that Hoff had breached the agreement. The government only called one witness, FBI Agent Southworth, who testified to the information received from Rock and the others. Hoff objected to much of South-

worth's testimony as hearsay. After the hearing, the magistrate judge issued a report to the district court, recommending that the district court take further evidence on Hoff's motion. The magistrate judge believed that the government had erred in attempting to prove Hoff's breach with hearsay evidence and that the government had not presented sufficient proper evidence to show a breach.

On August 6, 1996, the district judge held a supplementary hearing on Hoff's motion to dismiss. The government presented testimony from seven witnesses. Hoff did not put on any witnesses. Following the hearing, the court determined that the government had more than met the required preponderance of the evidence standard in establishing Hoff's breach and denied Hoff's motion to dismiss. The district court also held that this post-indictment, pretrial judicial determination of breach was sufficient, rejecting Hoff's argument that due process required a pre-indictment determination of his breach.

Meyer moved to suppress the statements he made to Agent Southworth based on his immunity agreement.[2] The prosecutors argued that Meyer had breached the agreement, thereby relieving them of their obligation not to use his statements. While noting that it was a close call, the district court held that the government had shown Meyer's breach by a preponderance of the evidence. Therefore, it found the use immunity agreement void and denied Meyer's motion to suppress.

The matter proceeded to trial where the government put on testimony from a large number of witnesses, many of whom were involved in drug activity and testified under grants of immunity. One of the government's principal witnesses was Rock, who had by this time entered into his own immunity agreement with the government. Under that agreement, Rock pled guilty to a federal drug charge in connection with his drug dealings with Hoff and Meyer and received a ten-year sentence. Additionally, Rock admitted

---

**2.** Initially, Meyer moved to dismiss the indictment, claiming that he had been promised immunity from prosecution. However, after examining Meyer's immunity agreement, the district court properly concluded that the agreement was

not a non-prosecution agreement but rather a promise for use immunity. Therefore, the district court viewed Meyer's motion as a motion to suppress statements, and we treat it as such on appeal.

his involvement in the Larson murder and was sentenced in state court to a twenty-year prison term for second degree murder. As part of his agreement, Rock agreed to provide information and to testify against his father and Eric Meyer. Rock admitted that at the time he entered into his agreement with the government, he was aware that his father and Meyer had provided the government with information that implicated him in drug dealing and murder.

At Hoff and Meyer's trial, Rock testified that his father began supplying him with drugs for resale in 1991. Rock testified that Hoff was getting his drugs from Fenner and from David Atherton. Hoff was also supplying Eric Meyer with drugs for resale. In 1993, in exchange for a stolen motorcycle, Hoff traded the right to sell drugs to Eric Meyer to Rock. From that point on, Rock testified, Meyer began obtaining drugs from Rock for resale both for cash and on credit. As time passed, Rock began obtaining drugs from sources other than Hoff. Rock testified that he was often able to obtain drugs elsewhere at a better price than his father was offering. On those occasions, Rock generally would purchase a kilogram of cocaine with the understanding that Hoff would purchase half of the cocaine from Rock. On occasion, before delivering Hoff's portion, Rock would add a cutting agent to the cocaine to dilute it. Additionally, Rock testified that on one occasion Meyer acted as a courier for him, transporting a kilogram of cocaine to Wisconsin from Indiana.

David Atherton also testified at trial pursuant to an immunity agreement. He stated that he supplied Hoff with marijuana and cocaine for resale and that on several occasions Hoff and Rock supplied him with drugs. Kathy Modl testified that she purchased cocaine and marijuana for resale from Hoff. Several other witnesses testified that they had purchased cocaine and marijuana from Hoff during the conspiracy period and to Meyer's involvement in drug trafficking. Since the testimony is voluminous and complex, we will address additional specific facts below when they are relevant to our analysis. At the conclusion of the trial, the jury found both Hoff and Meyer guilty on the drug conspiracy charges.

At sentencing, Judge Crabb found by a preponderance of the evidence that the drug offense involved approximately six kilograms of cocaine. Under 21 U.S.C. § 841(b)(1)(A)(ii), the defendants faced a statutory maximum sentence of life in prison. Under the Sentencing Guidelines, § 2D1.1 sets a base offense level of 32 for the conspiracy in question. With respect to defendant Hoff, the district judge considered relevant conduct under § 1B1.3(a)(1) and § 3D1.2(b) and specifically found that Hoff had murdered Daniel Oestreich, had directed Meyer to murder Fenner, had been involved in disposing of both of the bodies, and that the murders had been committed because Hoff believed that the victims were going to inform the police of his drug activities. Given these specific findings, Judge Crabb applied the cross-reference set out in § 2D1.1(d)(1) for cases in which "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111." This cross-reference directs the court to apply § 2A1.1 (First Degree Murder) which increased Hoff's base offense level to 43, the highest level available under the Guidelines. Level 43 carries with it a sentence of life imprisonment at all criminal history levels. Judge Crabb then added three levels for Hoff's role in the offense, two levels for obstruction of justice, and two levels for possession of firearms. Since Hoff was already at the highest offense level, these increases did not alter the length of his sentence. The court determined that Hoff had a criminal history category of four and sentenced him to life in prison.

In Eric Meyer's sentencing, § 2D1.1 again provided a base offense level of 32 for the conspiracy conviction. Judge Crabb specifically found that Meyer shot and killed Dennis Fenner and assisted in disposing of his body. She again utilized the cross-reference from § 2D1.1(d) to arrive at a base offense level of 43 under § 2A1.1. She then added two levels for obstruction. With a criminal history category of three and an offense level of 45, Meyer's sentencing range was life, and Judge Crabb sentenced Meyer to life imprisonment.

## II. ANALYSIS

### A. Buyer-Seller Jury Instruction

■ Hoff and Meyer assert that the district court erred in failing to instruct the jury that a mere buyer-seller relationship is insufficient to establish membership in a conspiracy. They contend that this failure deprived them of the opportunity to present a theory of defense. Appellants included a buyer-seller instruction with their proposed jury instructions. At the final pretrial conference, the magistrate judge went through the proposed instructions with the parties. In making his recommendations to the district judge, the magistrate included a buyer-seller instruction which stated "[p]roof that a defendant merely bought or sold drugs from alleged members of the alleged conspiracy is not sufficient, without more, to establish a defendant's guilt," but noted that the district judge would need to make the final determination on the instruction after hearing the evidence at trial. At the instructions conference following the close of evidence, the district judge considered whether to include the buyer-seller instruction. After hearing argument from both sides, the district judge rejected the instruction, stating

> I would like to give the defendants an opportunity to argue anything that is reasonable, but I just don't think there is anything reasonable about a buyer/seller instruction in this case. This is just not the sort of case in which a jury could ever find that that was the only relationship. If they believe the witnesses at all, they have to believe that this was more than a buyer/seller relationship so I will not give that instruction.

We review the district court's decision that a defendant has failed to present sufficient evidence to become entitled to a jury instruction on a theory of defense *de novo.* *United States v. Turner,* 93 F.3d 276, 285 (7th Cir. 1996) (citing *United States v. Bastanipour,* 41 F.3d 1178, 1183–84 (7th Cir.1994)).

■ A defendant must satisfy a four-part test before he is entitled to a jury instruction to present a theory of defense. He must show that (1) the proposed instruction is a correct statement of the law; (2) the evidence in the case supports the theory of defense; (3) the theory of defense is not already part of the charge; and (4) failure to include the proposed instruction would deny the defendant a fair trial. *Turner,* 93 F.3d at 285 (citing *United States v. Schulte,* 7 F.3d 698, 700 (7th Cir.1993)).

■ The government concedes, and we agree, that the proposed instruction represented a correct statement of the law in this circuit. *See United States v. Lechuga,* 994 F.2d 346, 349 (7th Cir.1993) (*en banc*). However, in order to be entitled to the instruction, the defendants must satisfy all four requirements. The district court held that the defendants failed to meet the second prong since there was no foundation in the evidence to justify giving the buyer-seller instruction. Hoff and Meyer contend that this ruling was erroneous. The second prong will be fulfilled if there is evidence sufficient to "create a reasonable doubt of guilt in the mind of a reasonable juror." *Tyson v. Trigg,* 50 F.3d 436, 448 (7th Cir.1995) (citing *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)); *see also United States v. Perez,* 86 F.3d 735, 736 (7th Cir.1996).

Appellants point to several specific areas of evidence which they assert support the buyer-seller theory of defense. Hoff cites Rock's testimony, together with the fact that no witness testified to making an agreement with Hoff beyond an agreement to buy, sell, or pay for drugs, to support his assertion. For further support, Hoff cites *United States v. Pedigo,* 12 F.3d 618 (7th Cir.1993). However, *Pedigo* is easily distinguishable from the present case. In *Pedigo,* the parties conducted only two drug transactions, and these transactions were completed within a few hours of one another. *Id.* at 625. In the present case, the evidence showed that Hoff and Rock entered into numerous drug transactions over a span of more than four years. Depending on the availability of the drugs, Hoff would sometimes act as buyer and sometimes as seller. These transactions involved large quantities of narcotics. Hoff argues Rock's testimony supports a theory that the father and son were actually competitors rather than coconspirators. While Rock testified that he sold drugs to his father at a profit and that he diluted cocaine before

selling it to his father, he also testified that he sold drugs for his father and consulted his father regarding drug buys. Rock testified that the profit he made off of sales to his father was small and that he viewed this profit as compensation for the risk and transportation involved in securing the drugs. There is no foundation in the evidence to support the proposition that the only relationship that existed between Hoff and Rock was that of a buyer and seller. Since Hoff fails to satisfy the second requirement, we need not address the remaining two prongs of the test. The district court correctly declined to give the jury a buyer-seller instruction with respect to Appellant Hoff.

Meyer, too, claims that he was entitled to a buyer-seller instruction. He points to Rock's testimony and his own statements to the FBI which the government introduced at trial as creating an evidentiary foundation to support the instruction. At trial, Rock testified that he supplied Meyer with drugs for redistribution and that sometimes Meyer would take these drugs on credit and would pay Rock after he sold them. Also, Rock testified that, on one occasion, Meyer transported a kilogram of cocaine from Indiana to Wisconsin for him. In exchange for Meyer assuming the risk of transporting the cocaine, Rock agreed to forgive Meyer's past drug debts totaling approximately $1500 and to give him a truck. There was also evidence that Meyer helped in the construction of an underground bunker to grow marijuana, aided in the modification of automobile fuel tanks to allow for concealed transportation of illegal drugs, and that on one occasion, Meyer stated that he was Hoff's "lieutenant." However, while these factors support a finding of conspiracy, there is also evidence in the record to the contrary. Significantly, after describing the relationship between himself and Meyer, on cross-examination Rock testified that Eric Meyer was just one of his "customers" for marijuana and cocaine. Rock distinguished between his relationship with his father, with whom he would discuss business decisions, and Eric Meyer. Rock stated that he would not discuss prices or sources with Meyer and that Meyer did not have any control over Rock's end of the business. Rock testified concerning Meyer, "[h]e just bought cocaine from me." The

evidence showed that Hoff also described Meyer as a drug "customer." Additionally, at trial, the government introduced Meyer's statement to the FBI in which Meyer only admitted to buying small quantities of drugs from Rock on several occasions.

Given the record as a whole, had the jury been properly focused on the distinction between a conspiracy and a mere buyer-seller relationship, it reasonably may have found that Meyer merely purchased drugs from the conspiracy. While the purchase of drugs constitutes a substantive drug offense, Meyer was charged only with two counts of conspiracy and not with any substantive drug offenses. A conspiracy charge requires the government to prove agreement to commit a crime other than the crime that consists of the sale itself. *United States v. Thomas*, 150 F.3d 743, 746 (7th Cir.1998) (per curiam). Agreement cannot be equated with repeated drug transactions. *Id.* A buyer-seller instruction "reminds juries that distribution of drugs is not itself conspiracy, although a history of transactions may be evidence of conspiracy." *Id.* There was sufficient evidence with regard to Eric Meyer to support a buyer-seller instruction in this case. Additionally, the buyer-seller theory was not included elsewhere in the charge. The government argues that the district court's definition of conspiracy together with the instruction that "mere association with conspirators or mere approval, presence, or knowledge of a conspiracy or conspiratorial acts are not sufficient, without more, to establish a defendant's guilt" presented the theory to the jury by requiring that the jury find conspiracy membership beyond a reasonable doubt. This is not an unreasonable argument; however, after examining the court's instructions as a whole, we must conclude that this general instruction was not sufficient to convey the mere purchaser theory to the jury. Since the evidence was such that a reasonable jury could have found that Meyer was merely a buyer from the conspiracy, the failure to give a buyer-seller instruction denied Meyer a fair trial. Therefore, the district court erred in refusing to give the proposed buyer-seller instruction with respect to Appellant Meyer, and Meyer's conviction must be reversed.

We can readily understand the district judge's reluctance to give Meyer the benefit of a buyer-seller instruction having heard all the testimony about the extensive and violent drug dealing of the parties. Even though the district judge was not satisfied with the evidentiary basis for the instruction, there was sufficient evidence to let the jury make that factual determination. In a dubious case it may often be better to give the proposed instruction and let the jury sort it out.

### B. Hoff's Immunity Agreement

Hoff raises two issues on appeal dealing with his immunity agreement. First, Hoff asserts that the fact that the prosecutors indicted him without first securing a judicial determination that Hoff had breached the agreement violated his right to due process. Secondly, Hoff argues that the district court abused its discretion in reopening the evidentiary hearing on his motion to dismiss the indictment, thereby giving the government a second chance to prove that Hoff had breached the immunity agreement. We review these two arguments separately.

### 1. Due Process Argument

■ After the government had entered into its agreement with Hoff and had received information from him, further investigation uncovered convincing evidence that Hoff had withheld information from investigators and had given false information. Investigators determined that, contrary to his statements to authorities, Hoff was involved in a long-term conspiracy to distribute both marijuana and cocaine and that Hoff had ordered the murder of Dennis Fenner. The government, believing that Hoff was in breach of the immunity agreement, indicted him. Hoff filed a motion to dismiss the indictment based on his immunity agreement. The magistrate judge held an evidentiary hearing to determine whether Hoff had breached the agreement, thereby releasing the government from its obligations under the agreement. After receiving the magistrate's report and recommendation, the district judge held a supplementary hearing on Hoff's motion. The district judge determined that Hoff had indeed breached his promise to the government and denied the motion to dismiss.

■ Hoff asks this court to reverse his conviction and to dismiss the case based on the timing of the evidentiary hearings. He asserts that due process required a pre-indictment hearing to determine breach. The government contends that a preindictment hearing is not constitutionally required and asserts that the district court's pretrial hearing to determine whether Hoff had breached his agreement with the government was sufficient to satisfy due process. We review Hoff's constitutional claim *de novo*. *Turner*, 93 F.3d at 286.

■ A fundamental requirement of the due process clause is that an individual receive notice and the opportunity for a hearing before he is deprived of a significant property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). With respect to immunity agreements, due process "requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves." *United States v. Eliason*, 3 F.3d 1149, 1153 (7th Cir.1993). However, if the suspect fails to fulfill his obligations under the contract, the government is relieved of its reciprocal obligations. *United States v. Verrusio*, 803 F.2d 885, 888 (7th Cir.1986) (citations omitted). "[D]ue process prevents the government from unilaterally determining that the defendant breached the ... agreement." *Id.* Rather, the government must obtain a judicial determination of the defendant's breach. *See id.* In the present case, Hoff does not contend that the district court erred in determining that he had breached the agreement, he merely contests the timing of that determination.

■ Absent exigent circumstances, an individual is entitled to a judicial determination of his breach before being deprived of his interest in the enforcement of an immunity agreement. *Verrusio*, 803 F.2d at 888. In *Verrusio*, we held that, under the facts of the case, a post-indictment evidentiary hearing on the defendant's alleged breach was sufficient to satisfy due process, because the ben-

efit of Verrusio's bargain was avoiding the risk of conviction on certain charges. Thus, Verrusio would be denied his interest in enforcing the agreement only if he were tried on those charges. The mere fact of an indictment did not deny Verrusio the benefit of his bargain. *Id.* at 889.

Hoff attempts to distinguish his agreement from the one in *Verrusio*. He argues that the agreement in *Verrusio* was a non-conviction agreement while his agreement promised non-prosecution. However, in making this assertion, Hoff fails to note the similarity in the terms of the two agreements. In *Verrusio*, the plea agreement provided that, in exchange for the defendant's performance, the government would dismiss eight pending charges and would not file any additional known charges or newly discovered charges occurring out of the same criminal conspiracy. *Id.* at 886–87 n. 1. Likewise, Hoff's agreement provided that, in exchange for Hoff's performance, the government would dismiss the charge currently pending against him and would not charge him with any other violations relating to the same criminal conspiracy or with other drug or money laundering violations. Notably, neither agreement addressed a particular procedure for the government to follow in the event of a perceived breach by the defendant. *See id.* at 899 n. 3 (noting that parties could contract for a preindictment hearing in the event of a perceived breach). In fact, Hoff's agreement provided "[i]f the government at anytime determines that the defendant is being less than fully cooperative or is not truthful, then the United States has the option of declaring this plea agreement void . . . ."

While Hoff attempts to distinguish his agreement from the agreement in *Verrusio* by referring to them by different names, the terms of the agreements provide for the same performance by the government. The benefit of Hoff's bargain, like Verrusio's, was to avoid the risk of conviction on charges arising from the drug conspiracy or from any money laundering or controlled substance vi-

olations.[3] The fact that Verrusio agreed to plead guilty to one count in addition to cooperating with the government while Hoff only agreed to cooperate alters the advantage for which the government bargained, but does not change the benefit of Hoff's bargain. In accordance with due process, Hoff was entitled to a judicial determination that he had breached the agreement before being subjected to the risk of conviction. The district court's pretrial evidentiary hearing satisfied this requirement. Nevertheless, we again stress that, in cases such as these, the preferred procedure, absent exigent circumstances, would be for the government to seek relief from its obligations under the immunity agreement prior to indictment. Since the government is required to obtain a judicial determination of a defendant's breach prior to trial, it is but a *de minimis* inconvenience for the government to secure that determination pre-indictment. *See United States v. Ataya,* 864 F.2d 1324, 1330 n. 9 (7th Cir. 1988). A pre-indictment hearing would curtail prosecutorial overreaching in drafting ambiguous immunity agreements and, in cases in which the defendant had fulfilled his obligations under the agreement, would help to prevent the government from using the threat of criminal prosecution "to achieve by coercion what it could not achieve through voluntary negotiation." *Id.* On the facts of the present case, however, Hoff received all of the protection demanded by due process.

2. Reopening of Evidentiary Hearing

 As noted above, when the government indicted Hoff for the second time, Hoff filed a motion to dismiss the indictment based on his immunity agreement. The magistrate judge held an evidentiary hearing, as allowed under 28 U.S.C. § 636(b)(1)(B). At this hearing, the government attempted to prove breach through the testimony of only one witness, Agent Southworth. Hoff's attorney objected to much of Southworth's testimony as hearsay. The

---

**3.** This finding is consistent with the treatment nonprosecution agreements have received in other circuits under similar circumstances. *See, e.g., United States v. Bailey,* 34 F.3d 683, 690 (8th Cir.1994) (holding that, under a non-prosecution agreement, a defendant bargains to avoid the

"risk of going to trial," i.e., conviction and punishment, and not to avoid trial); *United States v. Bird,* 709 F.2d 388, 392 (5th Cir.1983) (stating that a promise not to prosecute is in essence a grant of immunity from punishment).

magistrate, in his report and recommendation to the district judge, stated that he believed the government had erred in trying to prove Hoff's breach with hearsay evidence. He noted that the government had failed to produce sufficient non-hearsay testimony to prove a breach and recommended that Judge Crabb hear further evidence on the matter. Judge Crabb held a supplementary evidentiary hearing on Hoff's motion at which time the government called seven witnesses. Following this hearing, Judge Crabb determined that the government had shown breach by more than the required preponderance of the evidence standard and denied Hoff's motion to dismiss.

■■■ Hoff argues that the district court erred in reopening the evidentiary hearing on Hoff's motion to dismiss, thereby giving the government a second chance to prove that Hoff had breached the immunity agreement. We review for abuse of discretion. *United States v. Turk,* 870 F.2d 1304, 1307 (7th Cir.1989). We will reverse only if "it is clear that no reasonable person could concur" in the district judge's decision. *Ladien v. Astrachan,* 128 F.3d 1051, 1056 (7th Cir.1997) (internal quotations and citations omitted). " 'The district court's decision must strike us as fundamentally wrong for an abuse of discretion to occur.' " *Id.* (citing *Anderson v. United Parcel Service,* 915 F.2d 313, 315 (7th Cir.1990)).

In the present case, the district judge did not abuse her discretion in deciding to reopen the evidentiary hearing. Under 28 U.S.C. § 636(b)(1), when a district judge designates a magistrate to conduct an evidentiary hearing, the district judge "may also receive further evidence" on the matter. Judge Crabb's decision to exercise this statutory power cannot be viewed as clearly unreasonable or fundamentally wrong. Hoff's claim fails.

### C. Meyer's Immunity Agreement

■■■ Meyer disputes the district court's decision not to suppress his statements given to the FBI pursuant to his use immunity agreement. Under the agreement, Meyer was to provide "a complete and truthful statement" regarding his "knowledge of and involvement in criminal offenses including, but not limited to, controlled substance traf-

ficking." The agreement further stated that the immunity agreement would be void if Meyer provided the government with materially false information or if he intentionally "withheld material information at any point in time." In exchange, the government promised not to use any of Meyer's statements or any information he provided against him directly in any criminal prosecution.

■■■ On appeal, Meyer argues that the district court erred in concluding that his immunity agreement bound him to provide incriminating information against Hoff. We review this factual determination regarding the scope of Meyer's immunity agreement for clear error. *See United States v. Nelson,* 851 F.2d 976, 978 (7th Cir.1988). We will reverse only if, after a comprehensive review of the evidence, we are left with "the definite and firm conviction that a mistake has been made." *United States v. Duguay,* 93 F.3d 346, 349 (7th Cir.1996) (internal quotations and citation omitted).

Meyer's agreement expressly required Meyer to make a complete and truthful statement regarding his knowledge of criminal offenses and did not contain any exceptions. Meyer contends that the fact that Agent Southworth allowed Hoff and his attorney to remain in the room during Meyer's interview implicitly modified the agreement in such a way that Meyer was no longer required to provide information that would have incriminated Hoff. For support, Meyer points to Southworth's testimony at the sentencing hearing that he did not ask Meyer any questions about Hoff's criminal activity because he did not think he would get a good answer with Hoff and his attorney sitting in the room. However, while this situation is unusual, it did not necessarily alter the scope of Meyer's agreement. Agent Southworth testified that he had attempted several times to interview Meyer alone, but that Meyer would not agree to it. Additionally, the plain language of the agreement requires complete and truthful testimony, without exception, and this point was emphasized to Meyer at the beginning of the interview. Even if there may be some evidence to support Meyer's view of modification, there is also ample

evidence to the contrary. The district court's decision to admit Meyer's statement was not clearly erroneous.

### D. Refrigerator Search

 During the course of the joint drug and murder investigation, local law enforcement officials received a warrant to search a property known as the Ogg farm for two vehicles registered to Dennis Fenner. This search warrant did not indicate the names of the owners or residents of the Ogg farm. On May 2, 1994, county investigators executed the search warrant. During the search, one investigator noticed a refrigerator located about eight to ten feet from a mobile home on the premises. The refrigerator was partially covered by a tarp and was tied to a handcart. The officer lifted the tarp to inspect the refrigerator more closely. There was not a freezer door, so when the officer lifted the tarp, he was able to see into the freezer compartment where he observed drug paraphernalia, including a scale and baggies, and a cylindrical container. Further investigation disclosed a small amount of marijuana inside the container. Investigators used the evidence from the May 2 search to obtain another warrant on May 3, 1994. The May 3 search warrant authorized the search of the mobile home on the Ogg farm property which it identified as Hoff's residence.

Hoff filed a motion to suppress evidence, claiming that the search of the refrigerator was outside the scope of the warrant in violation of the Fourth Amendment. Hoff attached a copy of the May 2 and 3 search warrants to his motion in an attempt to establish that the property searched was his residence. In response to Hoff's motion, the government contended that Hoff lacked standing to contest the search. To support this assertion, the government submitted a transcript from a December 1994 Dunn County Court proceeding in which Hoff denied ownership of the refrigerator.[4] Hoff failed to produce further evidence or to file an affidavit asserting standing, choosing instead to rely only on his motion and the

search warrants. After evaluating all of the evidence, Judge Crabb noted that Hoff had not produced any evidence that he owned the mobile home or that he was occupying it at the time of the search despite the fact that he was on notice that he had to come forward with evidence to prove standing. She concluded that Hoff had failed to meet his burden of establishing a requisite interest in the refrigerator, and therefore, he lacked standing to object to its search.

 We review the district court's findings of fact after a suppression hearing for clear error, while reviewing conclusions of law and mixed questions of law and fact *de novo.* *Duguay,* 93 F.3d at 349–50. The party seeking suppression bears the burden of establishing that he had a reasonable expectation of privacy in the area and items searched. *United States v. Ruth,* 65 F.3d 599, 604 (7th Cir.1995). In order to establish a reasonable expectation of privacy, the party must show that he had an actual, subjective expectation of privacy that society is prepared to recognize as reasonable. *Id.* (citation omitted).

Since the police officers had a valid warrant to search Hoff's property for vehicles, Hoff challenges only the additional search of the refrigerator. Hoff argues that he had standing to challenge this search solely because the refrigerator was within his curtilage, relying on the two search warrants to prove that the refrigerator was within his curtilage. Hoff did not testify or submit an affidavit regarding his expectation of privacy in the refrigerator.

Hoff cites *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), to support his argument. In *Alderman,* the Court held that "[i]f the police make an unwarranted search of a house and seize tangible property belonging to third parties ... the homeowner may object to its use against him, not because he had any interest in the seized items as 'effects' protected by the Fourth Amendment, but because they were the fruit of an unauthorized search of

---

4. The government failed to meet a filing deadline set by the magistrate in submitting the state court transcript. The magistrate judge ruled that the government's submission was untimely and refused to consider it. The district court examined the matter and decided that the untimely material could be considered.

his house, which is itself expressly protected by the Fourth Amendment." *Id.* at 176–77, 89 S.Ct. 961. However, the Court was quick to note that if the police were to enter a house "pursuant to a valid warrant authorizing the seizure of specified gambling paraphernalia but discover illegal narcotics in the process of the search, the narcotics may be seized and introduced in evidence in the prosecution of the homeowner, whether the narcotics belong to him or to a third party." *Id.* at 177 n. 10, 89 S.Ct. 961.

■ In the present case, the police entered Hoff's curtilage pursuant to a valid warrant. Therefore, Hoff cannot raise a claim based on an unauthorized search of his curtilage. Hoff cannot assert a protected interest in the refrigerator based solely on the fact that the refrigerator was within his curtilage. He must establish that he had a reasonable expectation of privacy in the refrigerator. As noted above, Hoff does not claim that the refrigerator was his or assert that he had any expectation of privacy in the refrigerator apart from the fact that it was within his curtilage.[5] As was the case in *Ruth*, Hoff attempts to meet his burden by relying on the search warrants and testimony by a law enforcement officer. *See Ruth*, 65 F.3d at 604–05. In *Ruth*, we noted that since the existence of a privacy interest "depends, in part, on the defendant's subjective intent" it is "almost impossible" to establish a reasonable expectation of privacy without an affidavit or testimony from the defendant. *Id.* at 605. In the present case, Hoff fails to present any evidence showing that he had a subjective expectation of privacy in the refrigerator. Therefore, Hoff has failed to establish that he had a reasonable expectation of privacy in the refrigerator, and he does not have standing to challenge the search.[6]

### E. Cross-Examination of Rock

■ At trial, the government called Rock as one of its principal witnesses against Hoff.

On direct, the prosecutor established that Rock was serving a ten-year prison sentence after pleading guilty to federal drug charges. Rock also testified that he was serving a twenty-year state sentence for murder. Hoff's attorney sought to establish Rock's bias on cross-examination by showing that Rock knew that Hoff had provided the police with information that Rock was involved in drug trafficking and had committed two premeditated murders in furtherance of his drug activity. The district court allowed defense counsel to ask Rock if he was aware that Hoff had given the police information about Rock's involvement in drug dealing and the one murder for which Rock was serving the twenty-year sentence. The district court did not allow defense counsel to probe further into the details of Hoff's accusations against Rock or to explore the fact that the information that Hoff provided to the police exposed Rock to the possibility of two consecutive life sentences or the federal death penalty.

■ Hoff contends that the district court erred by denying him the opportunity to fully cross-examine Rock regarding Hoff's accusations. Hoff asserts that this denial prevented him from exposing the full extent of Rock's bias against him. We review for abuse of discretion. *United States v. Torres*, 965 F.2d 303, 310 (7th Cir.1992).

■ The Supreme Court has noted that exposing possible bias is "a proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citations omitted). However, the Confrontation Clause does not prevent a trial judge from imposing limits on the extent and scope of cross-examination. In fact, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based

---

**5.** Hoff may be reluctant to assert an interest in the refrigerator, due to the incriminating nature of its contents. However, while any of Hoff's pretrial assertions may be used against him indirectly at trial, he is afforded some protection since it is clear that testimony given to meet standing requirements for motions to suppress cannot be used as direct evidence against the defendant at trial on the question of guilt or

innocence. *See Simmons v. United States*, 390 U.S. 377, 390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

**6.** Since Hoff failed to present evidence sufficient to meet his burden of proof, we need not determine the effect of the state court transcript submitted by the government.

on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679, 106 S.Ct. 1431.

In his reply brief, Hoff cites *Lindh v. Murphy*, 124 F.3d 899 (7th Cir.1997), to support his argument. However, Hoff fails to note an important distinction between his case and *Van Arsdall* and *Lindh*. In both *Van Arsdall* and *Lindh*, the lower court was reversed because it prohibited all inquiry into the possibility of bias. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431; *Lindh*, 124 F.3d at 901. In the present case, Hoff was allowed to explore bias by exposing the fact that Rock was serving a twenty-year prison sentence for murder because of information Hoff provided to the police and that Rock was not happy about the situation. As we have noted,

> cross-examination has no natural limits, and the trial judge must therefore exercise judgment in deciding when the point of diminishing returns has been reached, or passed—a judgment that will depend on the particulars of each case, and on such unreviewable imponderables as the judge's assessment of the jury's comprehension and attention span.

*United States v. Akinrinade*, 61 F.3d 1279, 1285 (7th Cir.1995) (quoting *United States v. Herrera–Medina*, 853 F.2d 564, 566 (7th Cir. 1988)). In the present case, the district judge allowed the defense to establish, during an extensive cross-examination, that Rock had reason to be biased against his father since Hoff had provided the police with information incriminating Rock. Hoff argues that the more evidence he could present, the greater the bias he would be able to establish. However, it is up to the district judge to determine when the point of diminishing returns has been reached. Having allowed evidence of Rock's basic reason for bias, the district judge reasonably determined that additional evidence would be repetitive. This decision did not constitute an abuse of discretion.

## F. Sentencing Issues

Hoff[7] argues that the district court violated his right to due process by enhancing his drug conspiracy sentence based on alleged participation in murders during the course of the conspiracy and asks us to vacate his sentence and to remand the case for resentencing. Hoff does not contend that the district court incorrectly applied the Sentencing Guidelines; rather he argues that the way in which the Guidelines operate to create a life sentence in his case is unconstitutional. Since it implicates constitutional issues, we review the district court's sentencing determination *de novo*. *United States v. Neely*, 980 F.2d 1074, 1080 (7th Cir.1992).

Hoff asserts that the Sentencing Guidelines' cross-reference under § 2D1.1(d)(1) to first degree murder violates his right to due process, since he was never charged or convicted by a jury for murder. Even though the defendants were not tried for murder, Judge Crabb was able to consider evidence of the murders as "relevant conduct" under § 1B1.3(a)(1) which provides that cross-references in Chapter Two should be determined based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction ...." Hoff does not argue that the murders did not constitute relevant conduct under the Guidelines or that relevant conduct cannot be considered to enhance a defendant's sentence. Instead, he asserts that the application of the Guidelines is unconstitutional, since murder is "different" than other offenses. Hoff argues that no person should be sentenced for murder without first being convicted of murder after a jury trial.

While we realize that murder is the most odious of crimes, it is clear that "sentencing judges may look to the conduct surrounding the offense of conviction in fashioning an appropriate sentence, regardless of whether the defendant was ever charged with or convicted of that conduct, and re-

---

**7.** Since we must reverse and remand Meyer's conviction on other grounds, we do not address his sentencing claim.

gardless of whether he could be." *United States v. Dawn*, 129 F.3d 878, 884 (7th Cir. 1997) (collecting cases). Additionally, we must note that "taking into account conduct related to the offense of conviction in sentencing is not the same thing as holding the defendant criminally culpable for that conduct." *Id.* (citations omitted). At sentencing, a defendant does not have a right to have his sentence determination confined to facts proven beyond a reasonable doubt. *McMillan v. Pennsylvania*, 477 U.S. 79, 92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

Hoff relies on *United States v. Lombard*, 72 F.3d 170 (1st Cir.1995), to support his contention that a sentence enhancement for murder is so severe that it raises grave constitutional questions concerning the lesser procedural protections available at sentencing. In so doing, he ignores *United States v. Masters*, 978 F.2d 281 (7th Cir.1992), which we find controlling. A key distinction between the present case and *Lombard* is that the statute governing Lombard's sentencing, 18 U.S.C. § 924(e), set out a statutory minimum sentence, but did not have a stated statutory maximum. *Lombard*, 72 F.3d at 178; 18 U.S.C. § 924(e). The sentencing in the present case is governed by 21 U.S.C. § 841(b)(1)(A)(ii), which sets out an express statutory maximum sentence of life. As we noted in *Masters*, "[c]onviction at trial supplies all of the justification the Constitution requires for depriving the defendant of liberty for any term up to the maximum prescribed by statute." *Masters*, 978 F.2d at 286. "How much of that time to grant back in sentencing, and what procedures to use when doing so, are legislative rather than constitutional choices." *Id. In the present case, Hoff's life sentence was within the expressly stated statutory maximum for his offense of conviction.*

We have noted that increased precautions may be necessary in cases in which the use of cross-references dramatically alters the balance between trial and sentencing. *See Masters*, 978 F.2d at 287. In the present case, without consideration of the murders, Hoff would have scored an offense level of 39. An increase from level 39 to level 43 is not the type of drastic increase which would allow the sentencing enhancement to become the tail which wags the dog of the substantive

offense. *See id.* Judge Crabb's application of the Sentencing Guidelines did not violate Hoff's constitutional rights.

### III. CONCLUSION

Therefore, the decision of the district court is AFFIRMED with respect to Appellant Hoff. While we AFFIRM the judgment of the district court with respect to Appellant Meyer's immunity agreement claim, we REVERSE Meyer's conviction on his jury instruction claim and REMAND his case for a new trial.